**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8                         UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10

11   FRED HAMPTON JR., ET AL.,                 No. C-13-03094 DMR

12              Plaintiffs,                     **ORDER ON PLAINTIFFS' MOTION TO
                                                AMEND THE COMPLAINT AND**
13        v.                                    **DEFENDANTS' MOTIONS FOR
                                                SUMMARY JUDGMENT**
14   CITY OF OAKLAND, ET AL.,

15              Defendants.
     _____/
16

17        Plaintiffs Fred Hampton Jr., Nyoka Lowery, Dawn Scott, and Ramal Lamar filed a civil

18   rights action under 42 U.S.C. § 1983 and state law claiming that they suffered constitutional

19   violations committed by the City of Oakland ("Oakland"), the City of Emeryville ("Emeryville"),

20   and 50 Doe Defendant police officers employed by the Oakland Police Department ("OPD") and

21   Emeryville Police Department ("EPD").  On September 11, 2014, Oakland and Emeryville filed

22   motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  [Docket Nos. 66

23   (Oakland's Mot.), 67 (Emeryville's Mot.).]  On September 16, 2014, Plaintiffs filed a motion to

24   amend their complaint to name as Doe Defendants OPD officers Kittrell Carter and Bobby Ko and

25   EPD officers Richard Lee and Andrew Yu, which Defendants oppose.  [Docket Nos. 76 (Mot. to

26   Am.), 85 (Emeryville's Opp'n), 89 (Oakland's Opp'n).]  The court conducted a hearing on October

27   9, 2014, and ordered Oakland and Plaintiffs to submit supplemental briefing on Oakland's liability.

28   The parties timely filed the supplemental briefing. [Docket Nos. 96-99.]  For the reasons stated

below, Plaintiffs' motion to amend is denied.  Emeryville's motion for summary judgment is granted in part and denied in part.  Oakland's motion for summary judgment is granted in part and denied in part.

## I. Background

On January 21, 2013, OPD Officer Bradley Young responded to a report of a robbery with a caustic chemical on North Street in Oakland, California.  (Joint Statement of Facts Re City of Oakland's Mot. for Summ. J ("JSF") 1.)  When he arrived at the scene, Young met the victim, who was tearing and had visible swelling of her eyes.  (JSF 2.)  The victim reported that she was walking toward her home when an African American woman and a second woman of unknown race approached her from behind.  The women sprayed something in the victim's face that she believed was pepper spray and yanked her purse off her shoulder, which contained her iPhone and wallet.  (JSF 3-6.)  The victim further reported that the women then got into a white SUV with a gray trim, a Toyota Land Cruiser or Highlander, which departed in the direction of Telegraph Avenue.  (JSF 7.)  One of the women who assaulted the victim was wearing a white t-shirt.  (JSF 8.)

In accordance with OPD procedure regarding robberies of iPhones and other trackable electronic devices, another OPD officer, Jamin Creed, provided the victim's iPhone user ID and password to the Intake Unit of the OPD Family Services Section.  (Creed Decl., Sept. 8, 2014, ¶¶ 1-5, Ex. 1.)  Creed then relayed updates about the location of the stolen iPhone from the Intake Unit to police units in the field over the OPD radio broadcast channels.  (Creed Decl. ¶ 5.)  According to Creed, the iPhone location information available for broadcast over the radio may not have been the "real time" location of the phone at any given moment because she had to refresh the query to the tracking website in order to update the location information.  (Creed Decl. ¶ 5.)

EPD Officer Richard Lee, a fifteen-year veteran on patrol, received notification of the robbery on his OPD radio.[1]  (Lee Dep. 7, 8.)  Lee heard a report of an armed robbery of a cell phone involving female suspects who used pepper spray and fled in a "white SUV with a gray stripe on the bottom."  (Lee Dep. 8.)  No other description of the suspects was provided.  (Lee Dep. 9.)  EPD

---

[1] EPD officers have two radios in their cars: one for OPD dispatch and one for EPD dispatch. (Lee Dep. 8.)

United States District Court
For the Northern District of California

1  subsequently broadcast a report that the stolen phone, an iPhone, had been tracked in Emeryville at

2  the intersection of Powell and Christie Streets.  (Lee Dep. 10.)  EPD also relayed more information:

3  one of the suspects was an African American woman in her 20s who was wearing a white tee-shirt.

4  There was a second female suspect but no description was provided, and EPD reported that the

5  suspects were driving in a white Toyota Highlander or Land Cruiser.  (Lee Dep. 9, 10.)

6  　　　Lee was on Hollis Street driving northbound approaching Powell Street when he received the

7  suspect and vehicle descriptions.  (Lee Dep. 10.)  While stopped at the intersection of Powell and

8  Hollis Streets, he looked to his left in the direction of Powell and Christie Streets, where the phone

9  had last been tracked.  According to Lee, he "saw a similar type vehicle driving eastbound" from the

10  direction of Powell and Christie Streets (i.e., driving away from the last known location of the

11  phone).  (Lee Dep. 10-11.)  The vehicle drove by him and turned southbound on Hollis, past Lee,

12  and he saw a woman driving whom he thought matched the description of the robbery suspect.  (Lee

13  Dep. 11.)  The driver, Plaintiff Lowery, was a "black female, younger, wearing a white shirt and

14  [what] appeared to be a black jacket over that white shirt."  (Lee Dep. 11.)  He initially thought the

15  car was a white Japanese model SUV, and he noticed a gray stripe along the bottom of the car.  (Lee

16  Dep. 11.)  Based upon the fact that Lowery's car was a "similar model, Japanese-model type" "two-

17  [t]one vehicle" as had been described in the initial OPD dispatch, he decided to follow it.  (Lee Dep.

18  11, 12.)  He made a U-turn and followed the car southbound on Hollis Street, and as he drove, he

19  realized that the car was actually silver, not white, and that it was a Mitsubishi [Montero SUV], not

20  a Toyota.  (Lee Dep. 12.)  In addition, although there was no gray stripe, the molding along the

21  bottom of Lowery's car was "darker gray."  (Lee Dep. 17.)  According to Lee, "sometimes victims

22  and witnesses can get the colors wrong on cars."  (Lee Dep. 17.)

23  　　　All four plaintiffs had been walking at the Berkeley Marina that afternoon.  (Hampton Dep.

24  14.)  They left the marina in Lowery's car, driving south on San Pablo Avenue, intending to stop at

25  the Target store in Emeryville.  (Scott Dep. 10-11; Lowery Dep. 15-18.)  Lowery's description of

26  Plaintiffs' route conflicts with Lee's observation; according to Lee, Plaintiffs were driving east from

27  the direction of Powell and Christie Streets when they turned south on Hollis.  However, Lowery

28  testified that Plaintiffs turned west off of San Pablo Avenue at some point (i.e., toward the last

1   known location of the stolen phone), and then turned left again to go south on Hollis Street.

2   (Lowery Dep. 17-18.)  Therefore, according to Lowery, Plaintiffs were not driving away from the

3   direction of Powell and Christie Streets, where the victim's iPhone had last been tracked.

4          Lee radioed to EPD dispatch that he was behind the possible suspect vehicle and advised that

5   he would wait for backup before stopping the car.  (Lee Dep. 12-13.)  He continued to follow

6   Plaintiffs on Hollis Street and then on 40th Street going westbound toward the Target store on 40th

7   Street.  (Lee Dep. 13.)  Lowery and Scott testified that when they were approximately three blocks

8   away from Target, they spotted an Emeryville SUV police car passing Plaintiffs on Hollis, going the

9   opposite direction.  (Lowery Dep. 20; *see also* Scott Dep. 12-13.)  According to Lowery, the driver

10  of the police car made eye contact with Hampton, who was riding in the front seat.  (Lowery Dep.

11  20.)  It is not clear whether this was Lee's police car.  (*See* Lowery Dep. 20, Scott Dep. 13.)

12         Lee followed Plaintiffs into the Target parking lot.  (Lee Dep. 13, 16.)  Once inside the

13  parking lot, before Lee made contact and initiated a stop of Plaintiffs' vehicle, he received a dispatch

14  that the iPhone was still being tracked at Powell and Christie Streets.  (Lee Dep. 13-14.)  However,

15  the tracking information was being relayed from OPD, and in Lee's experience, iPhone tracking

16  does not always update in real time.  (Lee Dep. 14-15.)  Therefore, he decided to initiate the

17  detention.  (Lee Dep. 14.)  As Lowery parked the car, Lee blocked her in with his patrol vehicle, and

18  activated his red light, siren, and spotlight, intending to detain the four occupants for an

19  investigatory stop and to prevent them from fleeing on foot.  (Lee Dep. 16, 17.)  From inside the car,

20  Plaintiffs heard several cars pull up, lights flashing, and people running toward their car.  (Hampton

21  Dep. 23.)  Hampton looked in the rearview mirror and saw an estimated fifteen police vehicles.

22  (Hampton Dep. 28.)  According to the EPD event history log, Lee notified dispatch at 5:43 p.m. that

23  he was making the stop because the suspect vehicle was parking.  (Lee Dep. Ex. 1.)

24         Lee got out of his patrol vehicle with his handgun in the low-ready position, with the muzzle

25  of the firearm pointed in the downward position in front of him.  (Lee Dep. 17.)  A few seconds

26  later, two other EPD officers, Ingles and Yu, arrived.  (Lee Dep. 18.)  According to Scott, the

27  officers began to yell conflicting commands at Plaintiffs over a speaker, ordering Plaintiffs to put

28  their hands up, open the windows, and open the doors at the same time.  (Scott Dep. 16.)  Finally,

**United States District Court**
For the Northern District of California

1    the officers began to instruct the Plaintiffs to exit the car one at a time, beginning with the driver,

2    Lowery.  (Scott Dep. 17.)  According to Lee, he was the only one giving commands, and he ordered

3    the driver to exit the car first and walk backwards toward him.  (Lee Dep. 20-21.)  As Lowery was

4    backing up, she felt a gun in her back.  (Lowery Dep. 26-27.)  Ingles handcuffed Lowery and took

5    her behind Lee's patrol car.  (Lee Dep. 20.)  After she was handcuffed, she was searched by an

6    officer who checked her pockets and "shoved" her in a patrol car.  (Lowery Dep. 31-32.)

7          Meanwhile, OPD Officers Kittrell Carter and Bobby Ko had independently heard an OPD

8    radio broadcast regarding the robbery and subsequent tracking of the stolen phone.  (Carter Dep. 11-

9    12; Ko Dep. 7-9.)  Oakland dispatch advised that EPD had located a similar-looking SUV in the

10   parking lot of the Emeryville Target.  (Ko Dep. 9; Carter Decl., Sept. 8, 2014 ¶ 3, Ex. 1.)  Carter

11   traveled to the parking lot, arriving at some point after Lee had initiated the stop and detained

12   Lowery.  Ko, who was responding to a dispatch call to cover Carter, arrived in a separate car.

13   (Carter Dep. 14, 15; Ko Dep. 7-8; Lee Dep. 18-19.)  Carter and Ko assisted with the detention after

14   seeing that there were only two EPD officers to detain the four occupants of the vehicle.[2]  (Carter

15   Dep. 15.)  At 5:48 p.m., Carter heard a radio dispatch from Creed, who reported that the iPhone had

16   been turned off.  (Creed Decl. ¶ 7, Ex. 2; Carter Dep. 32.)  At some point after Carter and Ko

17   arrived, an unspecified number of OPD and EDP officers arrived on the scene.  (Carter Dep. 14.)

18         Carter handcuffed Hampton and Ko handcuffed Lamar.  (Lee Dep. 18-19, 21; Carter Dep.

19   15-16, 18; Carter Decl. ¶ 3, Ex. 1; JSF 10, 11.)  There is no evidence that Carter or Ko used force

20   beyond that required to handcuff Hampton and Lamar.  (Carter Decl. ¶ 3, Ex. 1; Creed Decl. ¶ 7, Ex.

21   2 at OAK000036 ("OPD USED NO FORCE").)  Scott got out of the car with her hands up and was

22   handcuffed by Yu.  (Scott Dep. 19-20; Lee Dep. 20.)  She did not see any officers with their firearms

23   drawn, but saw one officer putting his gun away as she walked around.  (Scott Dep. 22-23.)

24   According to Lee, a total of five OPD and EPD officers participated in handcuffing Plaintiffs.  (Lee

25   Dep. 20.)

26   

27        [2] Carter's testimony that there were only two EPD officers conflicts with Lee's testimony that

28   he was being assisted by Officers Yu and Ingles.  (*See* Lee Dep. 18.)  The parties do not explain this discrepancy.

United States District Court

For the Northern District of California

Scott testified that before she was handcuffed, she asked the officers why Plaintiffs were being pulled over and arrested.  (Scott Dep. 24.)  An unidentified officer told her that Plaintiffs' "vehicle was suspect[ed] in a robbery," and that someone had stolen an iPhone or an iPad.  (Scott Dep. 24, 27.)  According to Scott, she told the officers that her arm was "damaged" and that if they handcuffed her, "it's going to hurt it even more," so she asked them to be careful with her.  (Scott Dep. 24.)  In response, the officers laughed and handcuffed her with her hands behind her back and placed her in the back of a patrol vehicle.  (Scott Dep. 24.)  Before they closed the door, Scott told them that her arm was hurting, and they laughed and said, "If you be still, it wouldn't hurt."  (Scott Dep. 24-25.)  Lowery testified that she heard Scott complaining about her arm when she was being handcuffed.  (Lowery Dep. 37.)  Scott spent approximately 30 minutes in the back of the patrol car, crying and complaining the pain in her arm.  (Scott Dep. 25.)  Unidentified officers then removed Scott from the patrol car.  She stood crying and told them that she couldn't feel her arm.  (Scott Dep. 26.)  The officers again laughed and told her she would have to ask the sergeant to remove the handcuffs.  (Scott Dep. 26.)  Lee gave permission for the handcuffs to be switched to the front, and when they removed Scott's handcuffs, she was unable to move her arm and it fell to her side.  The officers told her to move her arm to the front so they could put her handcuffs on, and she told them she could not move it herself.  (Scott Dep. 27.)  The officers handcuffed her wrists in front of her body and then asked her if she had any weapons.  She told them she was carrying a pocketknife, which they removed from her pocket, and they permitted her to stand for the rest of the detention.  (Scott Dep. 27-28.)  According to Lee, at least fifteen minutes had elapsed between the initial stop and the time he spoke to Scott and allowed the officer to switch her handcuffs to the front.  (Lee Dep. 23-24.)

The EPD event history log states that at 5:48 p.m., approximately five minutes after Lee initiated the stop, OPD advised that the iPhone was on I-80 heading westbound toward the Bay Bridge.  (Lee Dep. Ex. 1.)  Lee does not recall hearing that information over his radio.  (Lee Dep. 39.)  He testified that he does not receive OPD radio broadcasts via the personal radio he carries on his belt.  (Lee Dep. 40.)  Approximately ten to fifteen minutes after initiating the stop, Lee learned from an OPD officer that the stolen iPhone had been tracked "somewhere on the freeway," and was

United States District Court
For the Northern District of California

1   not near the Target parking lot.  (Lee Dep. 34-35.)  He testified that based on this information, one

2   possibility was that he had detained the "wrong people," but there was also a possibility that

3   Plaintiffs had handed off the iPhone to someone else.  (Lee Dep. 35.)

4          After the four Plaintiffs had been handcuffed, the officers and Plaintiffs waited while OPD

5   Officer Young escorted the robbery victim to the Target parking lot in order to see if she could

6   identify any of the Plaintiffs as her assailants; Lee described this process as an "infield show-up."

7   (Young Decl., Sept. 8, 2014, ¶¶ 3, 4, Ex. 1; Lee Dep. 31.)  At some point, Carter told Hampton that

8   he was being detained "till we could ascertain whether he was involved in the robbery or not."

9   (Carter Dep. 18-19.)  However, there is no evidence that any officer informed any of the Plaintiffs at

10  any point that they were waiting for the victim to arrive for the infield show-up.  When she arrived,

11  Plaintiffs were walked in front of a vehicle one by one and turned from right to left.  (Lee Dep. 33,

12  Scott Dep. 30-31.)  The victim did not identify any of them as her assailants and the police removed

13  the handcuffs from Plaintiffs and released them.  (Scott Dep. 31; Lee Dep. 33-34.)  Ten to fifteen

14  minutes after the victim arrived, Lee was informed by an OPD officer that his assistance was no

15  longer necessary and he "cleared the scene."  (Lee Dep. 31-32.)  Lee testified that he completed the

16  stop and cleared the scene at 6:40 p.m.  (Lee Dep. 31.)  OPD supervisor Sergeant Jeffrey Thomason

17  received a call regarding a possible complaint about his officers, Carter and Ko, and traveled to the

18  Target parking lot, where he spoke with Lamar and Scott.  (Thomason Dep. 7-10.)  Scott was

19  eventually transported from the scene by ambulance to the hospital for treatment and continues to

20  experience pain in her arm.  (Scott Dep. 33, 41.)

21         The parties dispute how long the detention lasted, and there is conflicting evidence about this

22  issue.  Plaintiffs contend that they were held by the officers for an hour or longer, with Hampton

23  testifying that he was in handcuffs for approximately 60 to 90 minutes.  (Hampton Dep. 44, 46.)

24  However, Hampton admitted that he was not wearing a watch and his time estimate was based

25  "pretty much on how I felt."  (Hampton Dep. 44-45.)  Oakland contends that the detention lasted

26  approximately 35 minutes.  The "CAD purge," which appears to be OPD's report of events, shows

27  that Plaintiffs were detained as of 5:46 p.m. and that Young was en route to the Target parking lot

28  with the victim by 5:58 p.m., twelve minutes later.  (Creed Decl. ¶ 7, Ex. 2 (CAD purge).)  Carter

1    estimates that the victim arrived between 15-25 minutes after he handcuffed Hampton.[3]  (Carter

2    Dep. 21.)  The CAD purge appears to show that the OPD vehicle transporting the victim was at the

3    parking lot by 6:06 p.m., and an entry at 6:19 p.m. indicates that the field identification was

4    negative.  (CAD purge.)  Ko and Carter testified that they released Hampton and Lamar

5    "immediately" and "very shortly" after the field identification was completed.  (Ko Dep. 34; Carter

6    Decl. ¶ 5.)  In addition, Lowery testified that the officers had removed Plaintiffs' handcuffs by the

7    time Sergeant Thomason spoke with Lamar, (Lowery Dep. 43), and Sergeant Thomason testified

8    that he had arrived on the scene by 6:36 p.m.  (Thomason Dep. 29.)  Therefore, Oakland's evidence

9    actually shows that the detention lasted between approximately 33 minutes (5:46 p.m. (time

10   Plaintiffs detained)-6:19 p.m. (time of negative identification)) to 50 minutes (5:46 p.m. (time

11   Plaintiffs detained)-6:36 p.m. (Thomason's arrival on scene)).

12       Emeryville's evidence supports a longer detention time; according to Lee, he completed the

13   stop and cleared the scene one hour after the stop took place.  (Lee Dep. 31 ("The stop was around

14   5:40 and then I think we completed the stop, the investigation, at 6:40 p.m.").)  The EPD event

15   history log indicates that Lee initiated the stop at 5:43 p.m., and that he advised that Plaintiffs were

16   not the suspects at 6:45 p.m., just over one hour later.  (Lee Dep. Ex. 1.)  Based on this evidence, the

17   court concludes that there is a genuine dispute as to the length of Plaintiffs' detention, which lasted

18   anywhere from 33 minutes to at least one hour.

19                              **II.  Procedural History**

20       Plaintiffs filed their Complaint on July 3, 2013, naming the City of Oakland and the City of

21   Emeryville as defendants, along with 50 Doe Defendants.  In their first amended complaint, filed on

22   August 6, 2013, Plaintiffs identified Does 1-25 as Oakland employees and Does 26-50 as Emeryville

23   employees.  [Docket No. 14 (First Am. Compl.).]  Plaintiffs alleged the following nine causes of

24   action: 1) Section 1983 claim for unlawful seizure, based upon the Fourth Amendment to the United

25   States Constitution, against Does 1-50; 2) Section 1983 claim for excessive force, based upon the

26   Fourth Amendment, against Doe 1; 3) Section 1983 claim for First Amendment retaliation, against

27   _____

28       [3] Ko testified that he did not remember how long it took for the victim to appear for the field identification.  (Ko Dep. 35.)

8

1    Does 1-50; 4) Section 1983 claim against Emeryville and Oakland under *Monell v. Department of*

2    *Social Services of City of New York*, 436 U.S. 658 (1978); 5) state law false imprisonment against all

3    Defendants; 6) violation of California's Bane Act, California Civil Code section 52.1 against all

4    Defendants; 7) intentional infliction of emotional distress against all Defendants; 8) state law battery

5    by a peace officer against Emeryville and Doe 1; and 9) state law negligence against Emeryville and

6    Oakland.  (First Am. Compl.)

### III.  Motion to Amend

**A.      Legal Standard**

9           Under Federal Rule of Civil Procedure 15(a), leave to amend should be granted as a matter

10   of course, at least until the defendant files a responsive pleading.  After that point, leave to amend

11   should be granted unless amendment would cause prejudice to the opposing party, is sought in bad

12   faith, is futile, or creates undue delay.  Fed. R. Civ. P. 15(a).  Rule 15(a) provides that the court

13   should "freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)*.*  "This policy is to be

14   applied with extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th

15   Cir. 2003) (quotation omitted).  In the absence of an "apparent reason," such as undue delay, bad

16   faith, dilatory motive, prejudice to defendants, futility of the amendments, or repeated failure to cure

17   deficiencies in the complaint by prior amendment, it is an abuse of discretion for a district court to

18   refuse to grant leave to amend a complaint.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Lockheed*

19   *Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 986 (9th Cir.1999).  These factors do not

20   "merit equal weight," and "it is the consideration of prejudice to the opposing party that carries the

21   greatest weight."  *Eminence Capital*, 316 F.3d at 1052.  "Granting leave to amend does not

22   necessarily mean that the underlying allegations ultimately have merit."  *FlatWorld Interactives LLC*

23   *v. Apple Inc.*, 12-cv-01956-WHO, 2013 WL 6406437, at *3 (N.D. Cal. Dec. 6, 2013).  "Rather,

24   '[a]bsent prejudice, or a strong showing of any of the remaining [ ] factors, there exists a

25   *presumption* under Rule 15(a) in favor of granting leave to amend.'"  *Id.* (quoting *Eminence Capital*,

26   316 F.3d at 1052).

**B.      Analysis**

9

1    Plaintiffs move pursuant to Rule 15(a)(2) to amend their complaint to substitute Doe

2    defendants with EPD officers Lee and Yu and OPD officers Ko and Carter.  According to Plaintiffs,

3    good cause exists to grant their motion as they only recently determined the identities of the officers

4    responsible for the incidents at issue in the lawsuit.  Plaintiffs completed the key officer depositions

5    on August 18 and 19, 2014 and transcripts of the depositions were available on September 11, 2014.

6    Plaintiffs then moved to amend their complaint on September 16, 2014, five days after Emeryville

7    and Oakland moved for summary judgment.

8    As Plaintiffs' motion to amend was filed after Defendants moved for summary judgment,

9    they must make a "substantial showing" to support the amendment.  *See Maldonado v. City of*

10   *Oakland*, No. C 01 1970 MEJ, 2002 WL 826801, at *4 (N.D. Cal. April 29, 2002) (denying leave to

11   amend where plaintiff filed motion to amend to add police officer defendants two days before

12   noticed hearing date on defendant's summary judgment motion) (citing Schwarzer, Tashima &

13   Wagstaffe, *Federal Civil Procedure Before Trial*, § 8:420.1 (2002 ed.)).  This higher standard

14   prevents a party from using amendment to avoid summary judgment.  *See Schlacter-Jones v. Gen.*

15   *Tel. of Cal.,* 936 F.2d 435, 443 (9th Cir.1991), *abrogated on other grounds by Cramer v. Consol.*

16   *Freightways, Inc.,* 255 F.3d 683 (9th Cir.2001).  Here, Emeryville and Oakland present evidence

17   that Plaintiffs have known the names of the officers involved for nearly a year, since September and

18   October 2013 at the latest.  Emeryville identified the three EPD police officers involved (Lee, Yu,

19   and Ingles) in its initial disclosures, served on October 31, 2013.  It also provided Lee's incident

20   report, which detailed his involvement in the incident, including the facts that led to his initiation of

21   the stop, and stated that OPD handcuffed the men and EPD handcuffed the women.  (Allen Decl.,

22   Sept. 25, 2014, Ex. B.)  Oakland served its initial disclosures on September 24, 2013.  It included a

23   copy of the OPD's incident report of the events of January 21, 2013, including narratives from Ko

24   and Carter in which they described their actions at the scene and named the individual Plaintiffs

25   whom they searched and handcuffed. (Rosen Decl., Sept. 29, 2014, Attachs. 1, 2, 3.)  Yet Plaintiffs

26   waited until *after* Emeryville and Oakland filed their summary judgment motions to seek leave to

27   amend.

28

**United States District Court**
For the Northern District of California

1    Plaintiffs do not deny that they knew the names of the involved officers a year ago.  Instead,

2  they claim that the police reports did not provide specifics of each officer's involvement, and that

3  they needed to depose the officers in order to determine which officer was in charge at the scene,

4  who made the decision to detain Plaintiffs or continue the detention, and which EPD officers were

5  involved with the decisions to maintain Scott's handcuffs and then switch them to the front.

6  However, Plaintiffs concede that they never served interrogatories regarding the roles played by the

7  EPD and OPD officers.  They also admit that there was nothing that prevented them from doing so.

8  Based on these facts, the court finds that Plaintiffs' proposed amendment is precluded by undue

9  delay.  Further, the timing of Plaintiffs' motion suggests it may be an improper attempt to avoid

10  dismissal.  *See, e.g., Maldonado*, 2002 WL 826801, at *5; *Zasslow v. Menlo Park City Sch. Dist.*,

11  No. C-01-0537 SC, 2001 WL 1488617, at *16 (N.D. Cal. Nov. 19, 2001) (denying leave to amend to

12  add additional defendants where plaintiffs waited to request amendment until after defendant filed

13  summary judgment motion "pointing out the deficiencies in their complaint").

14    Additionally, the court finds that given the late stage of this litigation, Defendants and the

15  individual officers would be unduly prejudiced by Plaintiffs' amendment.  Defendants' motions for

16  summary judgment have already been impacted by Plaintiffs' delay.  The parties' pretrial

17  submissions are due at the end of this month, with trial set to commence in less than two months.

18  Officers Lee, Yu, Ko, and Carter have not been served with the complaint, and despite Plaintiffs'

19  speculation to the contrary, the question of their representation by Emeryville and Oakland is not a

20  foregone conclusion.  Therefore, as Plaintiffs have made no showing to excuse their failure to seek

21  amendment at a much earlier date, and Defendants and the individual officers would be unduly

22  prejudiced by Plaintiffs' proposed amendment, Plaintiffs' motion to amend is denied.

23                              **IV.  Motions for Summary Judgment**

24  **A.    Legal Standard**

25    A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

26  fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden of

27  establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*

28  *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light

most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Id.* at 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In other words, there must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not suffice. *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" when ruling on the motion. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

**B.      Claims No Longer At Issue**

Plaintiffs concede that there is no evidence to support the following claims: 1) Section 1983 claim for First Amendment retaliation; 2) *Monell* claim; 3) intentional infliction of emotional distress; and 4) negligence. Accordingly, the court grants summary judgment on these claims as to both Emeryville and Oakland. In addition, Plaintiffs concede that unless the individual officers are named as defendants, their 42 U.S.C. § 1983 claims for unlawful seizure and Scott's Section 1983 claim for excessive force must fail. As the court has denied Plaintiffs leave to amend their complaint to name the individual officers, it grants summary judgment on Plaintiffs' Section 1983 claims as to both Emeryville and Oakland.[4]

---

[4] The court also dismisses the 50 Doe Defendants from this action. There is no provision in the Federal Rules of Civil Procedure permitting the use of fictitious defendants. *See Fifty Assocs. v. Prudential Ins. Co. of Am.*, 446 F.2d 1187, 1191 (9th Cir. 1970); *see also Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery*, 44 F.3d 800, 803 (9th Cir. 1995) (affirming district court's grant of summary judgment in favor of non-appearing defendant).

**United States District Court**

For the Northern District of California

1    Finally, at the hearing, Plaintiffs conceded that Lowery and Scott have no claims against

2    Oakland.  Accordingly, summary judgment is granted as to Lowery and Scott's remaining state law

3    false imprisonment and Bane Act claims against Oakland, as well as Scott's state law battery claim

4    against Oakland.

5    **C.    Emeryville's Motion for Summary Judgment**

6        **1.    False Imprisonment Claim**

7        Plaintiffs bring a state law false imprisonment claim against Defendants pursuant to

8    California Government Code section 815.2.  Public employees are liable for injuries caused by their

9    acts or omissions to the same extent as private persons.  Cal. Gov't Code § 820.  California

10   Government Code section 815.2 provides that "[a] public entity is liable for injury proximately

11   caused by an act or omission of an employee of the public entity within the scope of his employment

12   if the act or omission would, apart from this section, have given rise to a cause of action against that

13   employee or his personal representative."  Cal. Gov't Code § 815.2(a).[5]  "Through [section 815.2],

14   the California Tort Claims Act expressly makes the doctrine of respondeat superior applicable to

15   public employers."  *Hoff v. Vacaville Unified Sch. Dist.*, 19 Cal. 4th 925, 932 (1998); *see Martinez v.*

16   *City of Los Angeles*, 141 F.3d 1373, 1380 (9th Cir. 1998) (holding that public entity may be liable

17   for false imprisonment under section 815.2).

18       Emeryville first argues that it is entitled to summary judgment on this claim on the grounds

19   that Plaintiffs' first amended complaint does not name any individual officers, only Doe Defendants.

20   According to Emeryville, a public entity may only be held liable on a theory of vicarious liability

21   where the employee "whose conduct is sought to be attributed to the employer [is] specifically

22   identified, if not joined as a defendant."  *See Munoz v. City of Union City*, 120 Cal. App. 4th 1077,

23   1113 (2004).  In support of its position, Emeryville cites two cases where courts dismissed claims

24   brought pursuant to section 815.2 against public entities for the actions of their employees where the

25   employees had never been identified.  *See King v. Fresno City Police Dep't*, No. CV F 04-6598

26

27       [5] Government Code section 815.2(b) provides that "a public entity is not liable for an injury
     resulting from an act or omission of an employee of the public entity where the employee is immune
28   from liability."

**United States District Court**

For the Northern District of California

1    LJO, 2006 WL 2827706, at *5 (E.D. Cal. Sept. 29, 2006); *Masoud v. Cnty. of San Joaquin*, No.

2    CIV.S-0601170 FCD EFB, 2006 WL 3251797, at *9 (E.D. Cal. Nov. 8, 2006).  However, in both of

3    those cases there was no evidence in the record identifying the officers who had allegedly committed

4    the torts.  Here, the record contains ample evidence identifying Lee and Yu as the EPD officers who

5    participated in Plaintiffs' detention.  As Emeryville has cited no authority requiring plaintiffs to

6    specifically name the responsible individuals in the complaint in order to establish a public entity's

7    liability under Section 815.2, the court finds that Plaintiffs' false imprisonment claim is not barred.

8         Emeryville next contends that Plaintiffs' claim fails because EPD's seizure of Plaintiffs was

9    lawful.  "False imprisonment is the unlawful violation of the personal liberty of another."  Cal. Penal

10   Code § 236; *see Collins v. City & Cnty. of San Francisco*, 50 Cal. App. 3d 671, 673 (1975) ("'false

11   arrest' and 'false imprisonment' are not separate torts.  False arrest is but one way of committing a

12   false imprisonment, and they are distinguishable only in terminology.").  Under California law, a

13   law enforcement officer is not liable for false arrest where the officer, acting within the scope of his

14   or her duty, makes a lawful arrest or "at the time of the arrest, had reasonable cause to believe the

15   arrest was lawful."  Cal. Penal Code § 847(b)(1); *Cervantes v. United States*, 330 F.3d 1186, 1188

16   (9th Cir. 2003).  Emeryville argues that EPD's detention of Plaintiffs was not an arrest, but was an

17   investigatory stop that was supported by Lee's reasonable suspicion.  In the alternative, it argues that

18   if the officers' detention of Plaintiffs was an arrest, it was supported by probable cause.  The court

19   will first examine whether the stop was a detention or an arrest.

             **a.    Whether Plaintiffs Were Arrested or Detained**

21        "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the

22   Government."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9

23   (1968)).  The California Constitution includes a similar provision.  *People v. Celis*, 33 Cal. 4th 667,

24   673 (2004) (citing Cal. Const. art. 1, § 13 ("The right of the people to be secure in their persons,

25   houses, papers, and effects against unreasonable seizures and searches may not be violated")).  "The

26   United States Constitution defines the minimum protection provided under Article 1, [Section] 13 of

27   the California Constitution."  *Barsamian v. City of Kingsburg*, 597 F. Supp. 2d 1054, 1065 (E.D.

28   Cal. 2009) (citing *Craft v. Cnty. of San Bernardino*, 468 F. Supp. 2d 1172, 1180 (C.D. Cal. 2006)

United States District Court

For the Northern District of California

1  (quotation marks omitted).  "Thus, it is appropriate to consider Fourth Amendment jurisprudence in

2  analyzing a claim that is based upon a purported violation of California's similar constitutional

3  provision." *Id.*; *see also Sorgen v. City and Cnty. of San Francisco*, No. C 05-03172 THE, 2006 WL

4  2583683, at *9 (N.D. Cal. Sept. 7, 2006) ("State and federal law are consistent with respect to the

5  standard for probable cause to arrest." (citing *People v. Memro*, 11 Cal. 4th 786, 843 (1995)).

6         In *Terry*, the Supreme Court elaborated a three-tier structure of Fourth Amendment

7  jurisprudence.  *See United States v. Erwin,* 803 F.2d 1505, 1508 (9th Cir. 1986) (summarizing

8  *Terry*).  "The first tier consists of those law enforcement activities, such as police questioning

9  conducted pursuant to valid consent, that do not constitute searches or seizures governed by the

10 Fourth Amendment."  *Erwin*, 803 F.2d at 1508.

11        "The second tier consists of limited intrusions such as pat-downs of the outer clothing (or

12 'frisks') and brief investigative detentions.  To justify these 'limited' searches and seizures, law

13 enforcement officials must possess a reasonable, articulable suspicion that the suspect has recently

14 committed a crime or is about to commit one."  *Id.; see also Celis*, 33 Cal. 4th at 674 ("an officer

15 who lacks probable cause to arrest can conduct a brief investigative detention when there is some

16 objective manifestation that criminal activity is afoot and that the person to be stopped is engaged in

17 that activity." (citation and quotation marks omitted)).  During a so-called *Terry* stop, police officers

18 are entitled to employ reasonable measures to protect themselves and others in potentially dangerous

19 situations.  *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056-57 (9th Cir. 1995).  "Investigative stops

20 based upon suspicion short of probable cause are . . . constitutionally permissible only where the

21 means utilized are the least intrusive reasonably available."  *Kraus v. Pierce Cnty.*, 793 F.2d 1105,

22 1108 (9th Cir. 1986); *Celis*, 33 Cal. 4th at 675.  "[A]n investigative detention must be temporary and

23 last no longer than is necessary to effectuate the purpose of the stop.  Similarly, the investigative

24 methods employed should be the least intrusive means reasonably available to verify or dispel the

25 officer's suspicion in a short period of time."  *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319,

26 1325-26 (1983).

27        "The third tier comprises 'full scale' searches or arrests requiring probable cause."  *Erwin*,

28 803 F.2d at 1508; *Kraus*, 793 F.2d at 1108 ("Where more than a limited intrusion occurs, an arrest

**United States District Court**
For the Northern District of California

occurs and probable cause is required."). To determine whether a seizure has ripened into a full-scale arrest, the court must consider the "totality of the circumstances." *United States v. Del Vizo*, 918 F.2d 821, 824 (9th Cir. 1990) (quoting *United States v. Baron*, 860 F.2d 911, 914 (9th Cir. 1988), *cert. denied*, 490 U.S. 1040 (1989)). No one factor is dispositive when evaluating the totality of the circumstances, which includes "the extent that freedom of movement is curtailed and the degree and type of force or authority used to effectuate the stop." *Kraus*, 793 F.2d at 1109 (citation omitted); *see also Del Vizo*, 918 F.2d at 824. Courts also consider the duration of the stop, as "[t]he United States Supreme Court has said that 'the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion.'" *Celis*, 33 Cal. 4th at 675 (citing *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). "This is a highly fact-specific inquiry that considers the intrusiveness of the methods used in light of whether these methods were 'reasonable *given the specific circumstances*.'" *Green v. City & Cnty. of San Francisco*, 751 F.3d 1039, 1047 (9th Cir. 2014) (quoting *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996)) (noting that "because this inquiry is fact specific, it is often left to the determination of a jury"). The proper focus in determining whether the coerciveness or restraint used in a stop is sufficient to constitute an arrest is viewed from the perspective of the person seized, not from the perspective of the officers. *City of Portland*, 73 F.3d at 235 (citation omitted). The test is whether "a reasonable innocent person in these circumstances would not have felt free to leave after brief questioning," *id.*, "i.e., that indefinite custodial detention is inevitable." *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) (citing *Kraus*, 793 F.2d at 1109 ("where force is used such that the innocent person could reasonably have believed he was not free to go and that he was being taken into custody indefinitely, an arrest has occurred." (citation omitted))).

Aggressive police conduct will not necessarily be deemed an arrest when it is in response to legitimate officer safety concerns. *Stevens v. Rose*, 298 F.3d 880, 883-84 (9th Cir. 2002) (citing *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001)). "[H]andcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop." *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982). Nonetheless,

United States District Court

For the Northern District of California

1   "police conducting on-the-scene investigations involving potentially dangerous suspects may take

2   precautionary measures if they are reasonably necessary." *Id.* Thus the mere fact that a person is

3   handcuffed does not necessarily elevate a *Terry* stop into an arrest. *See, e.g., Bautista*, 684 F.2d at

4   1289-1291 (handcuffing did not turn *Terry* stop into an arrest where individuals handcuffed were

5   "suspected of robbery in which three men with guns participated and a third robber might still have

6   been in the vicinity" and questioned separately for 10-12 minutes). "The issue is whether the use of

7   handcuffs during a detention was reasonably necessary under all of the circumstances of the

8   detention." *In re Antonio B.*, 166 Cal. App. 4th 435, 441 (2008). The Ninth Circuit has held that

9   "while there are no bright-line rules, . . . the use of especially intrusive means of effecting a stop" is

10  only allowed in "special circumstances, such as 1) where the suspect is uncooperative or takes action

11  at the scene that raises a reasonable possibility of danger or flight; 2) where the police have

12  information that the suspect is currently armed; 3) where the stop closely follows a violent crime;

13  and 4) where the police have information that a crime that may involve violence is about to occur."

14  *Green*, 751 F.3d at 1047 (citing *Washington*, 98 F.3d at 1189) (quotation marks omitted).

15          Here, a reasonable jury, viewing the facts in the light most favorable to Plaintiffs, could find

16  that this incident ripened into an arrest based on the intrusive tactics used by the officers on the

17  scene, including the display of firearms and handcuffing. The testimony regarding the use of

18  firearms is not entirely clear, but at least one officer (Lee) displayed his firearm for some portion of

19  the stop. Lee testified that he was not pointing his firearm at Plaintiffs when he ordered them out of

20  the car, but that he was holding it in the low-ready position and it was visible to Plaintiffs. Scott saw

21  one officer putting his gun away when she walked around the car, and as Lowery backed away from

22  her car toward the officers, she felt a gun in her back. All parties agree that plaintiffs were

23  handcuffed and searched, and Lowery and Scott placed in the back of patrol cars. The length of

24  their detention is in dispute, lasting between 33 minutes to approximately one hour. As to the first

25  *Washington* factor, it is undisputed that Plaintiffs were cooperative throughout the incident. They

26  immediately put their hands up and followed all instructions from the officers, taking no actions that

27  raised a possibility of danger to the officers or flight. In fact, despite seeing an EPD patrol car pass

28  them on their way to the Target store and making eye contact with the officer, Plaintiffs made no

United States District Court

For the Northern District of California

1   attempt to evade the police.  Instead, they parked their car in a public parking lot where they could

2   be easily apprehended.  *See Del Vizo*, 918 F.2d at 823-825 (individual arrested where police stopped

3   his car, ordered him out, made him lie down on the street and handcuffed him, where there was no

4   evidence that he was noncompliant or dangerous; "Given the extensive limits placed on [his]

5   freedom and the lack of investigatory justification for the degree of the restraints, we have little

6   difficulty concluding that [he] was arrested . . . .").  No weapons were found on Plaintiffs, other than

7   Scott's pocketknife, which she immediately identified to the officers.

8       The second and third *Washington* factors, where police have information that a suspect is

9   currently armed and the stop closely follows a violent crime, do not weigh heavily in favor of

10  aggressive police action here.  The stop took place shortly after the victim was mugged with pepper

11  spray, and the officers could have reasonably believed the suspects were still armed with pepper

12  spray.  However, Plaintiffs were cooperative and the officers quickly determined that they were

13  unarmed.  Thus, the need for aggressive tactics dissipated early on in the stop, especially given the

14  number of police officers present, which is "highly relevant."  *Green*, 751 F.3d at 1047; *see United*

15  *States v. Bautista*, 684 F.2d 1286, 1289-90 (9th Cir. 1982) (handcuffing did not convert initial

16  detention into arrest; it was not unreasonable for officer to take "adequate protective measures

17  before remaining [alone] with two men suspected of armed bank robbery" while his partner went to

18  nearby house to check suspects' story).  Five officers actively participated in Plaintiffs' detention,

19  and there is evidence that there were as many as fifteen police vehicles on the scene.  There is

20  simply no evidence that Plaintiffs posed any threat to the officers once they were searched.

21  Therefore, this factor weighs in favor of finding that it was unreasonable for the officers to employ

22  such intrusive tactics.  *See Green*, 751 F.3d at 1048.  As to the final *Washington* factor, the officers

23  had no information that a crime of violence was about to occur.

24      The Ninth Circuit has directed that the *Washington* factors "should all be considered in light

25  of the specificity of the information law enforcement has to suggest both that the individuals are the

26  proper suspects and that they are likely to resist arrest or police interrogation."  *Green*, 751 F.3d at

27  1047.  Here, Plaintiffs' similarity to the description of the suspects was not particularly substantial,

28  which weighs against the use of intrusive tactics.  *See Washington*, 98 F.3d at 1190-92 (use of

United States District Court

For the Northern District of California

1  aggressive and intrusive tactics "not warranted" where plaintiffs' physical characteristics did not

2  match the few vague, general descriptions of the suspects; "similarity of description [was] tenuous

3  and there [was] no other information suggesting that the person to be questioned [was] the person

4  thought to have committed an offense").  The description of one of the suspects as an African

5  American woman wearing a white tee-shirt in her 20s was fairly general.  *See id.* at 1190

6  (description of suspects was "two African-American males, one reasonably short and one reasonably

7  tall").  While Lowery is an African American woman, the evidence in the record is that she is 35

8  years old at the youngest.  (Lowery Dep. 60 ("our age group is like from 35 to 42 or something, mid

9  40s.")  There is no evidence in the record that she appears younger than her age.  There is also

10  evidence that at the time of the detention, she wore her hair in a large Afro style, a distinctive feature

11  that was not part of the victim's description.  (Lowery Dep. 60.)  In addition, her car, a silver

12  Mitsubishi SUV, did not match the specific description of the suspects' vehicle as a white Toyota

13  SUV.  It is undisputed that Lee realized the distinction between Lowery's car and the suspects' car

14  almost immediately after he began following Plaintiffs, well before he initiated the stop.

15       Another factor to consider as part of the totality of the circumstances "may include whether

16  the officer informed the individual that handcuffing or detention would cease once the officers

17  conducted an investigation if they determined no crime had occurred."  *Perez-Morciglio v. Las*

18  *Vegas Metro. Police Dep't*, 820 F. Supp. 2d 1111, 1120-21 (D. Nev. 2011) (citing *United States v.*

19  *Johnson*, 581 F.3d 994, 999 (9th Cir. 2009); *United States v. Bravo*, 295 F.3d 1002, 1011 (9th Cir.

20  2002)).  Here, the evidence shows that the officers gave only Hampton and Scott limited information

21  about the circumstances of their detention.  Carter told Hampton that Plaintiffs' vehicle fit the

22  description of a vehicle that had been used in a robbery and that he was being detained "till we could

23  ascertain whether he was involved in the robbery or not."  (Carter Dep. 18-19.)  Another

24  unidentified officer told Scott that Plaintiffs' "vehicle was suspect[ed] in a robbery," and that

25  someone had stolen an iPhone or an iPad.  (Scott Dep. 27.)  There is no evidence that the officers

26  advised Plaintiffs that they were being handcuffed for safety reasons or that Plaintiffs learned from

27  the officers at any point that the victim was en route to the parking lot for possible identification of

28  her assailants.  *See Johnson*, 581 F.3d at 999 (officers' repeated assurances that "detention might be

United States District Court
For the Northern District of California

nothing more than a misunderstanding and that its purpose was merely investigatory" was a factor in the totality of the circumstances); *Bravo*, 295 F.3d at 1011 (considering a factor in totality of circumstances analysis fact that officers told suspect handcuffs were for safety and would be removed once they reached security office a short distance away). Therefore, this factor weighs in favor of finding that Plaintiffs' detention was an arrest.

Emeryville cites *Gallegos v. City of Los Angeles*, 308 F.3d 987 (9th Cir. 2002), to support its claim that Plaintiffs' detention did not become an arrest, arguing that the facts of that case are similar to the incident at issue here. In *Gallegos*, officers responded to a 911 call by a woman claiming her father was trying to break into her house in violation of a restraining order. She described him as a Hispanic male wearing a red shirt and blue pants. *Id.* at 989. Officers dispatched to the scene in a police helicopter saw the plaintiff leave a house across the street from the victim's and drive away in a truck. The plaintiff, a Hispanic man, was wearing a red shirt and tan shorts. *Id.* Mistakenly believing that he was the burglary suspect, officers pulled him over a few miles away from the scene, ordered him from his truck at gunpoint, handcuffed him, placed him in the back of the patrol car, and drove him to the scene of the crime for identification. *Id.* Once at the scene a witness confirmed that the plaintiff was not the suspect, and the police released him after detaining him for a total of 45 minutes to an hour. *Id.* The Ninth Circuit concluded that the officers' actions were "objectively reasonable under the circumstances," and that the plaintiff's detention was "a valid investigatory stop." *Id.* at 992. As the court noted, "[t]he whole point of an investigatory stop . . . is to allow police to *investigate* . . . to make sure that they have the right person." *Id.* at 991. Ultimately, the court concluded that "this investigative stop worked as it should. The detention was brief, calculated solely to make sure they had the right man, and resulted in [the plaintiff's] prompt vindication." *Id.* at 992.

Unlike *Gallegos*, the record in this matter does not conclusively demonstrate that the EPD and OPD officers' actions were objectively reasonable in these circumstances. In *Gallegos*, while the plaintiff matched only a general description of a suspect (Hispanic male in red shirt), he was spotted leaving the scene of an attempted burglary. Here, Plaintiffs were not seen at the location of the crime or where the stolen iPhone had been tracked, and importantly, their travel route is

United States District Court

For the Northern District of California

1    disputed.  Lee testified that he observed Plaintiffs driving away from Powell and Christie Streets,

2    where the iPhone had been tracked.  However, Lowery testified that she was driving westbound

3    when she turned on Hollis Street, and not eastbound, as she would have been had she been driving

4    away from Powell and Christie Streets.  Therefore, not only were Plaintiffs not seen at the scene of

5    the crime or the location of the stolen iPhone, unlike the plaintiff in *Gallegos*, there is a dispute

6    about whether Plaintiffs were driving from the *opposite* direction of the location of the iPhone.

7         In sum, a reasonable jury, viewing the facts in the light most favorable to Plaintiffs, could

8    find that the actions of the officers constituted an arrest.

9              **b.**      **Whether Plaintiffs' Arrest Was Supported by Probable Cause**

10         Having concluded that a reasonable jury could conclude that Plaintiffs' detention constituted

11    an arrest, the court turns to the question of whether EPD had probable cause to arrest Plaintiffs.

12         "Under the Fourth Amendment, a warrantless arrest requires probable cause."  *United States*

13    *v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692, 700

14    (1981)).  Probable cause to arrest exists when officers have knowledge or reasonably trustworthy

15    information sufficient to lead a person of reasonable caution to believe that an offense has been or is

16    being committed by the person being arrested.  *Id.* (citing *Beck v. Ohio,* 379 U.S. 89, 91 (1964)).

17    "Alternatively, this court has defined probable cause as follows: when 'under the totality of

18    circumstances known to the arresting officers, a prudent person would have concluded that there was

19    a fair probability that [the defendant] had committed a crime.'"  *Id.* (citing *United States v. Smith,*

20    790 F.2d 789, 792 (9th Cir. 1986); *Celis*, 33 Cal. 4th at 673 ("Probable cause exists when the facts

21    known to the arresting officer would persuade someone of 'reasonable caution' that the person to be

22    arrested has committed a crime." (citation omitted)).  While conclusive evidence of guilt is not

23    necessary under this standard to establish probable cause, "[m]ere suspicion, common rumor, or

24    even strong reason to suspect are not enough."  *McKenzie v. Lamb,* 738 F.2d 1005, 1008 (9th Cir.

25    1984) (citing *Henry v. United States,* 361 U.S. 98, 101 (1959)).  "Probable cause is lacking if the

26    circumstances relied on are susceptible to a variety of credible interpretations not necessarily

27    compatible with nefarious activities."  *Gasho v. United States*, 39 F.3d 1420, 1432 (9th Cir. 1994).

28         Probable cause must be determined at the time the arrest is made.  Facts learned or evidence

United States District Court

For the Northern District of California

1   obtained as a result of a stop or arrest cannot be used to support probable cause unless they were

2   known to the officer at the moment the arrest was made.  *City of Portland*, 73 F.3d at 235 (citing

3   *Wong Sun v. United States*, 371 U.S. 471, 482 (1963)).  Under the collective knowledge doctrine, in

4   determining whether probable cause exists for arrest, courts look to "the collective knowledge of all

5   the officers involved in the criminal investigation."  *United States v. Ramirez,* 473 F.3d 1026, 1032

6   (9th Cir. 2007) (citation and quotation marks omitted).  "Where the facts or circumstances

7   surrounding an individual's arrest are disputed, the existence of probable cause is a question for the

8   jury."  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008) (citing *McKenzie,* 738

9   F.2d at 1008).

10          Emeryville argues that probable cause existed for the arrests, because Lee stopped Plaintiffs'

11   vehicle "in temporal and geographic proximity" to the last reported location of the stolen iPhone, the

12   vehicle was of a similar make, model, and distinguishing characteristic (i.e., the gray stripe), and the

13   driver, Lowery, matched the description of one of the assailants.  The court finds that a reasonable

14   jury could conclude that this information was insufficient to provide probable cause for their arrests.

15   As to Lowery, while she resembled the general physical description of one of the suspects (African

16   American woman), she did not match it closely (at least 35 years old instead of "in her 20s,"

17   wearing a white T-shirt, but under a black jacket).  A reasonable jury could conclude that the

18   officers needed a more particularized belief to arrest her for the crime.  *See Grant v. City of Long*

19   *Beach*, 315 F.3d 1081, 1088 (9th Cir. 2002) ("[u]nder the law of this Circuit, mere resemblance to a

20   general description is not enough to establish probable cause" (citing *Washington*, 98 F.3d at 1190-

21   91)).  In addition, Lowery indisputably wore a large Afro hairstyle.  A reasonable juror could

22   determine that Lee should have accounted for the fact that the victim's description of the assailant

23   did not include such a distinctive feature, thereby diminishing the likelihood that Lowery was

24   involved in the crime. While Lowery's car bore general similarities to the color, make, and model

25   (silver Mitsubishi Montero SUV with dark gray molding) of the car used by the victim's assailants,

26   the victim had provided a fairly precise description of the car as a white Toyota Highlander or

27   Landcruiser with a gray stripe, and there was no indication that the victim's description was simply a

28   guess or an estimate.  Although Emeryville relies on the fact that Lee observed Plaintiffs driving

1   eastbound, away from Powell and Christie Streets where the iPhone had been tracked, and then

2   turning southbound on Hollis Street, as discussed above, this is an important disputed fact.  Lowery

3   testified that she was driving westbound when she turned on Hollis Street, and not eastbound.  In

4   other words, according to Lowery, she was driving toward the stolen phone, which would diminish

5   the likelihood that she was involved in the crime.  Lee testified to the exact opposite fact – that he

6   saw the car driving away from – not toward – the scene of the crime.  A jury must determine which

7   of the competing accounts of this important fact is true.  Finally, removing Plaintiffs from the car

8   and searching them prior to handcuffing them did nothing to increase the probability of the officers'

9   suspicions, as none of the Plaintiffs were armed with pepper spray or any other weapon, other than

10  Scott's pocketknife.  As to Hampton, Scott, and Lamar, their presence in Lowery's car was the only

11  fact connecting them to the crime.  A reasonable jury could conclude that the facts connecting

12  Plaintiffs to the attack, taken together, were insufficient to establish probable cause for their arrest.

13          **c.       Whether Plaintiffs' Detention Was Supported by Reasonable Suspicion**

14          Plaintiffs also argue the alternative; i.e., that even if their detention constituted a *Terry* stop

15  and not an arrest, EPD did not have reasonable suspicion to conduct the stop.

16          An investigatory or *Terry* stop is reasonable under the Fourth Amendment if "the officer's

17  action was justified at its inception" and the investigation "was reasonably related in scope to the

18  circumstances which justified the interference in the first place."  *United States v. Sharpe*, 470 U.S.

19  675, 682 (1985) (quoting *Terry*, 392 U.S. at 20); *see also Royer*, 460 U.S. at 498 ("*Terry* created a

20  limited exception to th[e] general rule" that police detentions require probable cause, wherein

21  "certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a

22  person has committed or is about to commit a crime.").  An officer's action is justified at its

23  inception if the officer had "reasonable suspicion" of criminal activity before initiating an

24  investigatory stop.  *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  Reasonable suspicion means the

25  officer must be able to identify "specific and articulable facts which, taken together with rational

26  inferences from those facts, reasonably warrant that intrusion."  *Terry*, 392 U.S. at 21; *see also*

27  *United States v. Cortez*, 449 U.S. 411, 417 (1981) (holding that "the totality of the circumstances –

28  the whole picture – must be taken into account" when determining if an officer had reasonable

United States District Court

For the Northern District of California

suspicion to perform an investigatory stop).  The reasonable suspicion standard "'is a less demanding standard than probable cause,' and merely requires 'a minimal level of objective justification.'"  *Gallegos*, 308 F.3d at 990 (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).  When detaining a person under *Terry*, a police officer is entitled to conduct a limited investigation to determine if the person was involved in criminal activity.  *See United States v. Hensley*, 469 U.S. 221, 229 (1985); *Royer*, 460 U.S. at 498; *Terry*, 392 U.S. at 30.

Here, when asked why he initiated Plaintiffs' detention, Lee responded "looking at the totality of the circumstances, the vehicle leaving the scene from where the phone was being tracked, the driver was matching the description of the suspect." (Lee Dep. 14.)  He later summarized his reasonable suspicion to stop Plaintiffs as follows:

> Given what I heard on the Oakland radio about the description, black female suspects, black and white two-tone car with a gray stripe on the bottom, the phone being tracked to our city at Powell and Christie, me being in the vicinity of where it was being tracked, seeing the car with a similar make on it, Japanese make with a gray stripe on it, the driver being close to the description to the female suspect, that raised my suspicions.  I know sometimes victims and witnesses can get the colors wrong on cars, that's why I still made the forced investigative stop.

(Lee Dep. 17.)  Plaintiffs take issue with each of these facts, arguing that "Lee claims reasonable suspicion by discounting or ignoring all of the facts that indicate that the plaintiffs were not the suspects." (Pls.' Opp'n to Emeryville's Mot. 13-14.)

Looking at the totality of the circumstances, and viewing the facts in the light most favorable to Plaintiffs, the court finds that a reasonable jury could conclude that Lee did not possess a reasonable suspicion to conduct an investigatory stop.  As set forth above, a key fact supporting Lee's articulated reasons for reasonable suspicion is disputed: whether Plaintiffs were driving away from, or coming from the opposite direction of, the location of the tracked iPhone.  A reasonable jury could resolve this dispute in Plaintiffs' favor[6] and conclude that the only remaining bases for reasonable suspicion, taken together – Lowery's purported resemblance to the suspect, her car's similarity to the suspect's car, and Plaintiffs' presence in Emeryville – were inadequate to support a

---

[6]  In making such a finding, the jury would have to determine that Lee was either not telling the truth, or was not credible for other reasons.  Such a determination could affect the jury's overall view of Lee's stated bases for initiating the stop.

24

reasonable, particularized suspicion that Plaintiffs had committed the robbery. This is particularly so where Plaintiffs have presented evidence creating a factual dispute as to whether Lowery fit the description of the assailant. In addition, whether Lee's determination that Lowery's car was adequately similar to the description of the suspects' car was reasonable is disputed, given the absence of evidence that the victim's description was anything less than exact.

### 2.     Plaintiff Scott's State Law Battery Claim

Scott brings a state law battery claim against Emeryville based on her handcuffing, arguing that EPD officers ignored her complaints of pain and left her handcuffed for at 30 minutes while she was crying and complaining of pain. Emeryville moves for summary judgment on this claim on the grounds that its officers used only reasonable force against Scott, and that the officers promptly switched her handcuffs to the front as soon as she complained of pain. The law governing a state law claim for battery is the same as that used to analyze a claim for excessive force under the Fourth Amendment. *See Sorgen*, 2006 WL 2583683, at *9 (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1274-75 (1998)).

A claim of excessive force in the context of an arrest or investigatory stop implicates the Fourth Amendment right to be free from "unreasonable . . . seizures." U.S. Const. amend. IV; *see Graham v. Connor*, 490 U.S. 386, 394 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396 (citations and internal quotation marks omitted). Because the reasonableness standard is not capable of precise definition or mechanical application, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The "most important single element" is whether there is an immediate threat to safety. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). Courts also consider the "'quantum of force' used to arrest the plaintiff, the availability of alternative methods of capturing or detaining the suspect, and

the plaintiff's mental and emotional state." *Luchtel v. Hagemann*, 623 F.3d 975, 980 (9th Cir. 2010) (internal citations omitted).

The reasonableness inquiry in excessive force cases is an objective one: whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation and without the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396.  "[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston*, 120 F.3d at 976 n.10.  "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted).

Emeryville acknowledges that an officer may be liable for excessive force if they handcuff a suspect in a tight or painful manner and ignore complaints of pain.  *See, e.g., Wall v. Cnty. of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004) (reversing qualified immunity claim where officer allegedly continued to restrain plaintiff "by handcuffs that hurt and damaged [plaintiff's] wrist," noting that "[i]t is well-established that overly tight handcuffing can constitute excessive force"); *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993) (officer "presented no evidence that would justify handcuffing [plaintiff] so tightly that he suffered pain and bruises, or to justify his refusal to loosen the handcuffs after [plaintiff] complained of the pain.").  It argues that when Scott complained of pain, the officers acknowledged her pain and switched her handcuffs to her front.

Key disputed facts preclude summary judgment on Scott's excessive force claim against Emeryville based on her handcuffing.  Scott testified that she told the officers that her arm was damaged and asked them to be careful, but that they laughed and handcuffed her anyway, telling her to "be still."  Lee testified that at least fifteen minutes had elapsed between the initial stop and the time he spoke to Scott and allowed the officer to switch her handcuffs to the front, but Scott testified that she cried and complained of the pain in her arm due to the handcuffs for 30 minutes, while she sat in the patrol car.  Further, Lowery testified that she heard Scott complaining about her arm, although her testimony is not clear about when and how long Scott complained.  Given these

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   disputes of fact, summary judgment as to Scott's excessive force and battery claims is denied.  *See*

2   *Avina*, 681 F.3d at 1130 (noting that summary judgment in excessive force cases should be granted

3   sparingly, as "the excessive force inquiry nearly always requires a jury to sift through disputed

4   factual contentions, and to draw inferences therefrom").

5            **3.       California Civil Code Section 52.1 Claim**

6            Finally, Emeryville moves for summary judgment on Plaintiffs' California Civil Code

7   section 52.1 claim.  California Civil Code section 52.1, the Bane Act, gives rise to a claim where "a

8   person or persons, whether or not acting under color of law, interferes by threats, intimidation, or

9   coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or

10  enjoyment by any individual or individuals of rights secured by the Constitution or laws of the

11  United States, or of the rights secured by the Constitution or laws of this state."  Cal. Civ. Code §

12  52.1(a).  Hampton, Lowery, and Lamar's Bane Act claims are based upon their false imprisonment

13  claims.  Scott's Bane Act claim is based upon her false imprisonment and battery claims.

14          Emeryville moves for summary judgment on Plaintiffs' Bane Act claims solely on the

15  grounds that the underlying claims lack merit.  *See Reynolds v. Cnty. of San Diego*, 84 F.3d 1162,

16  1170-71 (9th Cir. 1996) ("because there is no federal constitutional violation and no conduct

17  specified which constitutes a state constitutional violation, there is no conduct upon which to base a

18  claim for liability under 52.1.").  As the court denies summary judgment on the underlying claims,

19  summary judgment on Plaintiffs' Bane Act claim is denied.

20  **D.       Oakland's Motion for Summary Judgment**

21          As noted, the only remaining claims against Oakland are Hampton and Lamar's false

22  imprisonment and Bane Act claims.

23          **1.       False Imprisonment Claim**

24          Oakland moves for summary judgment on Plaintiffs' Section 1983 claim based upon their

25  detention, arguing that OPD officers' involvement at the scene was limited to assisting EPD officers

26  in Hampton and Lamar's detention.  Oakland argues that Carter and Ko detained those plaintiffs in

27  handcuffs for approximately 35 minutes, and that their detention was reasonable because it lasted

28  only as long as necessary to dispel suspicions about Hampton and Lamar's involvement with the

United States District Court

For the Northern District of California

1  robbery.  According to Oakland, the duration and circumstances of the detention were reasonable as

2  a matter of law.

3      Following the hearing, the court ordered Oakland and Plaintiffs to submit supplemental

4  briefing regarding which set of facts the court may consider in evaluating Oakland's reasonable

5  suspicion for Plaintiffs' detention or arrest, and whether there are any facts relied upon by

6  Emeryville that the court may not consider for purposes of Oakland's liability.  In its briefing,

7  Oakland argues that Plaintiffs' counsel conceded at oral argument that Plaintiffs' claims against

8  Oakland are based solely on vicarious liability for the conduct of Carter and Ko after the vehicle

9  stop had already been made by Emeryville police.  According to Oakland, that concession precludes

10  liability based on any challenge to the reasonableness of the stop.  In other words, Oakland argues

11  that the question of whether reasonable suspicion or probable cause supported Plaintiffs' detention

12  or arrest is irrelevant as to its liability.  The court disagrees.  First, Plaintiffs' purported concession

13  came amidst a discussion about the *length of the detention*, with Plaintiffs' counsel stating that for

14  purposes of Oakland's liability for the actions of its officers, the court should look at the period of

15  time when Carter and Ko were actually at the scene of the detention.  They did not abandon their

16  challenge to the *reasonableness* of the stop as it pertains to Oakland's liability.  To the contrary,

17  Plaintiffs repeatedly stressed their position that Carter and Ko's detention of Hampton and Lamar

18  must have been supported by reasonable suspicion.  Moreover, Oakland cites no authority to support

19  this position.

20      In the alternative, Oakland argues that the relevant information regarding reasonable

21  suspicion or probable cause as it relates to Oakland's liability is that which was in possession of

22  Carter and Ko on the scene.  This information does not include facts about whether the car was

23  traveling eastbound or westbound when Lowery turned on Hollis Street, facts of which the OPD

24  officers were unaware.  Plaintiffs do not dispute that these are relevant facts for purposes of

25  determining Oakland's liability.  Additionally, Oakland argues that Carter and Ko were entitled to

26  rely on EPD's assessment of the totality of the circumstances necessary to support the vehicle stop.

27      It is undisputed that Carter heard radio broadcasts reporting the robbery and the description

28  of the suspects and their vehicle.  (Carter Dep. 11-12.)  Oakland's CAD purge describes the suspects

as two female African Americans, one wearing a white tee shirt.  It also describes the suspects'

vehicle as a white Toyota Land Cruiser or Highlander with "poss gry trim."  (CAD purge.)  A CAD

purge entry twenty minutes after the first description of the vehicle states that the suspects' vehicle

is a white Toyota SUV, possibly a Land Cruiser or Highlander.  (CAD purge.)  Carter testified that

he heard a description of two African American women, one wearing a white tee shirt, driving a

"light-color SUV, possibly a Highlander or a Land Cruiser."  (Carter Dep. 12, 28.)

Carter and Ko were also aware that the victim's stolen iPhone had been tracked in

Emeryville.  (Carter Dep. 12-13; Ko Dep. 27.)  Carter testified that he believed that the iPhone had

first been tracked to the Target store in Emeryville.  (Carter Dep. 12-13, 29-30.)  He testified that he

received a dispatch that the phone had stopped at the Target parking lot and had been turned off.

(Carter Dep. 32-33.)  Carter then received a dispatch that the phone was on Christie Street moving

toward Powell Street, shortly before receiving the dispatch that Emeryville police were stopping a

vehicle at the Target parking lot.  (Carter Dep. 31-32.)  However, he testified that he did not receive

any information that would reconcile the fact that the officers were stopping a vehicle at the Target

store even though the phone had last been tracked elsewhere.  (Carter Dep. 31-33.)  At some point,

Carter learned that the phone had been turned back on and had been tracked to the toll plaza at the

Bay Bridge.  (Carter Dep. 33.)  Ko testified that he heard a radio dispatch that Emeryville police

officers had stopped a vehicle that was possibly related to a robbery.  (Ko Dep. 9.)  He also testified

that he received a transmission that the phone was near Powell and Christie Streets, but that once he

got on the scene, he did not hear any further dispatches about the phone's location.  (Ko Dep. 27, 33-

34.)

Once on the scene, the officers helped detain Hampton and Lamar as they were ordered out

of Lowery's car.  Carter testified that he only remembers that Plaintiffs' vehicle was "light-colored";

he could not remember its specific color.  (Carter Dep. 17-18.)  Ko did not recall the color of

Plaintiffs' vehicle.  (Ko Dep. 10.)  Carter also testified that he saw the two African American women

who had been in the car, and that both women were detained by Emeryville police officers.  (Carter

Dep. 23.)  He does not recall what they were wearing.  (Carter Dep. 24.)  Carter testified that he

believed that it was proper for him to detain Hampton based on "the information that [officers] were

1    provided by dispatch, the other officers on scene, the vehicle matched the description given by the

2    victim" of a "light-colored vehicle."  (Carter Dep. 17.)  However, he did not provide any details

3    about any information he was given by other officers on the scene.  It is undisputed that Officers

4    Carter and Ko handcuffed and searched Hampton and Lamar and maintained them in handcuffs

5    throughout the incident, until they were released.

6          First, as to whether Hampton and Lamar were arrested or merely detained in an investigatory

7    stop, the court finds that a reasonable jury could find that Hampton and Lamar were arrested for the

8    same reasons discussed above.  Further, for the same reasons as those discussed above, a reasonable

9    jury could conclude that under the totality of the circumstances, the facts known by Carter and Ko

10   which purportedly connected Plaintiffs to the attack – Lowery's resemblance to one of the suspects,

11   her car's similarity to the suspects' car's make, model, and color, and Plaintiffs' presence in

12   Emeryville, where the phone had been tracked – were insufficient to establish probable cause for

13   Hampton and Lamar's arrests.

14         Oakland argues that it cannot be vicariously liable for Carter and Ko's actions if they

15   reasonably relied on information from a fellow officer that turns out to be incorrect, arguing that

16   they were entitled to rely on EPD's assessment of the totality of the circumstances necessary to

17   support the vehicle stop.  In support, Oakland cites *Coello v. City of Hermosa Beach*, No. CV 07-

18   6900 PSG (Ssx), 2009 WL 426408, at *1, 4 (C.D. Cal. Feb. 19, 2009), and *Williams v. Town of*

19   *White Hall, Alabama*, 450 F. Supp. 2d 1300, 1304 (M.D. Ala. 2006).  These cases are

20   distinguishable.  In *Coello*, a police officer got into an argument with the plaintiff after the officer

21   responded to a neighbor's complaint of a loud party and subsequently announced over the police

22   radio that he was taking the plaintiff in for making a false 911 call.  2009 WL 426408, at *1.  Two

23   officers responded to the call and assisted in arresting the plaintiff.  *Id.*  The court granted the

24   assisting officers summary judgment on the plaintiff's unlawful arrest claim on the grounds that they

25   were entitled to rely on the first officer's factual assertions supporting probable cause, a point which

26   the plaintiff apparently conceded.  *Id.* at *4.  In *Williams*, the plaintiff was suspected of using a

27   counterfeit bill at a gaming center and was subsequently ejected and questioned by police.  450 F.

28   Supp. 2d at 1302.  The next day, he returned to the gaming center and was again ejected.  This time,

**United States District Court**

For the Northern District of California

1   police handcuffed him and placed him in a police vehicle.  At the mayor's direction, the police then

2   brought the plaintiff to the mayor's office where he questioned the plaintiff for approximately 30 to

3   40 minutes before being released.  *Id.* at 1302-03.  The court found that the mayor's decision to have

4   the plaintiff arrested was reasonable and supported by probable cause, because he reasonably relied

5   on the officers' statements that the plaintiff was creating a disturbance at the gaming center.  *Id.* at

6   1305.  Therefore, in both *Coello* and *Williams*, the courts relied on the well-settled proposition that

7   "law enforcement officers are generally entitled to rely on information obtained from fellow law

8   enforcement officers," even if that information later turns out to be wrong.  *Motley v. Parks*, 432

9   F.3d 1072, 1081 (9th Cir. 2005) (en banc) (citation omitted).  Here, Carter and Ko were in

10  possession of all of the same information EPD had about the description of the suspects and the car,

11  as well as the location of the stolen iPhone.  There is no evidence in the record of any other

12  information EPD provided them that connected Plaintiffs to the crime.  On this record, the court

13  cannot say that Oakland must be absolved of liability for its officers' arrests of Hampton and Lamar

14  based on reasonably relying on information from EPD.

15        As to whether Hampton and Lamar's detention was supported by reasonable suspicion, the

16  court finds that summary judgment must be denied as to Oakland for the same reasons as discussed

17  above with respect to Emeryville.  The OPD officers were aware of the victim's description of the

18  suspects and their vehicle.  A reasonable jury could conclude that Lowery and her car were

19  dissimilar enough from the victim's descriptions that Carter and Ko lacked reasonable suspicion to

20  detain Hampton and Lamar, particularly where the victim described her assailants as two *women*,

21  not men.  Oakland makes a great deal about the fact that Carter and Ko merely responded to the

22  scene of an ongoing police action.  However, it cites no authority supporting its claim that it cannot

23  be held liable for participating in an unlawful detention where its officers were aware of and relied

24  on the same information as the initiating officers, with the exception of the information about

25  Plaintiffs' path of travel to the Target store, to support the detention.  Accordingly, summary

26  judgment as to Hampton and Lamar's false imprisonment claims against Oakland is denied.

27        **2.      California Civil Code Section 52.1 Claim**

28

United States District Court

For the Northern District of California

1    Finally, Oakland moves for summary judgment on Hampton and Lamar's Bane Act claim on

2  the grounds that an unlawful arrest alone, without evidence of coercion or intimidation, cannot serve

3  as the basis for a Bane Act claim.  Essentially, Oakland argues that a section 52.1 claim requires

4  proof of coercion or intimidation beyond that inherent in the detention itself.  Plaintiffs respond that

5  a section 52.1 claim does not require separate coercion or intimidation when the defendant's actions

6  are intentional, rather than merely negligent.

7    As noted above, California Civil Code section 52.1 gives rise to a claim where "a person or

8  persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or

9  attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any

10  individual or individuals of rights secured by the Constitution or laws of the United States, or of the

11  rights secured by the Constitution or laws of this state."  Cal. Civ. Code § 52.1(a).  To prevail on a

12  Bane Act claim, a plaintiff must demonstrate, *inter alia*, "intimidation, threats or coercion."  *Jones v.*

13  *Kmart Corp.*, 17 Cal.4th 329, 334 (1998).  In *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th

14  947 (2012), the court examined the issue of whether a section 52.1 claim lies where a defendant

15  merely acts negligently, with no intent.  In that case, the plaintiff alleged that he had been wrongly

16  detained in county jail for sixteen days due to an admitted clerical error.  *Id.* at 951.  He argued that

17  the "intimidation and coercion inherent in being incarcerated is sufficient to show that [a] defendant

18  interfered by threats, intimidation, or coercion with his right to be free from an unreasonable seizure."

19  *Id.* at 958.  The court conceptualized the issue of first impression as two related questions: "[(1)

20  [w]hat type of interference is contemplated by the statute–intentional and callous interference only

21  or also incidental interference brought about by negligent conduct? [and] [(2)] . . . where coercion is

22  inherent in the constitutional violation alleged, as it is in an unreasonably prolonged detention, is the

23  statutory requirement satisfied or does the statute require a showing of coercion independent from

24  the coercion inherent in the wrongful detention itself?"  *Id.*

25    The court held that, as to the first question, "[t]he act of interference with a constitutional

26  right must itself be deliberate or spiteful."  *Id.* at 959.  As to the second question, *Shoyoye* held that

27  section 52.1 "requires a showing of coercion *independent from* the coercion inherent in the wrongful

28  detention itself."  *Id.* (emphasis added).  Because the defendant had not acted deliberately in holding

the plaintiff longer than was warranted and there was no coercion independent from the coercion inherent in the plaintiff's wrongful detention, the court concluded that the plaintiff had failed to prove his section 52.1 claim. *Id.* at 961-62.

The weight of authority in this District has limited *Shoyoye* "to its first holding, that section 52.1 requires intentional interference with a constitutional right, and not merely negligent acts."; i.e., to circumstances involving negligent conduct. *See D.V. v. City of Sunnyvale*, --- F. Supp. 2d ---, 2014 WL 4072338, at *5 (N.D. Cal. Aug. 14, 2014) (collecting cases); *but see Valdez v. City of San Jose*, No. 4:09-cv-0176 KAW, 2013 WL 6108052, at *12 (N.D. Cal. Nov. 18, 2013) (granting summary judgment on 52.1 claim based on unlawful arrest alone with no showing of coercion independent from the coercion inherent in the wrongful detention itself). This court agrees with the reasoning of the majority of courts in this District and concludes that a section 52.1 claim "does not require threats, coercion, or intimidation independent from the threats, coercion, or intimidation inherent in the alleged constitutional or statutory violation." *See D.V.*, 2014 WL 4072338, at *5. Here, Oakland does not argue that Hampton or Lamar's detention or arrest was the result of negligence on its part, and the undisputed facts show intentional conduct by the OPD officers. Accordingly, summary judgment on Plaintiffs' section 52.1 claim is denied.

**V. Conclusion**

For the foregoing reasons, Plaintiffs' motion to amend is denied. Emeryville's motion for summary judgment is granted in part and denied in part, as follows: summary judgment is GRANTED as to Plaintiffs' 1) Section 1983 claim for First Amendment retaliation; 2) *Monell* claim; 3) intentional infliction of emotional distress claim; 4) negligence claim; and 5) Section 1983 claim for unlawful seizure. Summary judgment is also GRANTED as to Plaintiff Scott's Section 1983 claim for excessive force. Summary judgment is DENIED as to Plaintiffs' false imprisonment and Bane Act claims against Emeryville, and as to Plaintiff Scott's battery claim against Emeryville.

Oakland's motion for summary judgment is granted in part and denied in part, as follows: summary judgment is GRANTED as to Plaintiffs' 1) Section 1983 claim for First Amendment retaliation; 2) *Monell* claim; 3) intentional infliction of emotional distress claim; 4) negligence claim; and 5) Section 1983 claim for unlawful seizure. Summary judgment is GRANTED as to

1    Plaintiff Lowery and Scott's false imprisonment and Bane Act claims against Oakland, and as to

2    Plaintiff Scott's Section 1983 excessive force claim and battery claim.  Summary judgment is

3    DENIED as to Plaintiffs Hampton and Lamar's false imprisonment and Bane Act claims against

4    Oakland.

5

6             IT IS SO ORDERED.

7

8    Dated: November 3, 2014

9                                                         
                                                          _____
                                                          DONNA M. RYU
10                                                        United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28